**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| B4 HEALTH MANAGEMENT LLC, and CHRISTIE MESSINGER, | **)** | Case No. |
| | **)** | |
| | **)** | |
| Plaintiff, | **)** | JUDGE: |
| | **)** | |
| v. | **)** | |
| | **)** | |
| JACK HALL, SHERIFF, LORAIN COUNTY, | **)** | **COMPLAINT** |
| OHIO, in his personal capacity; | **)** | |
| TONY CILLO, LORAIN COUNTY | **)** | |
| PROSECUTOR, in his personal capacity; | **)** | |
| BILLIE JO BELCHER, in her individual | **)** | |
| capacity. | **)** | **(JURY DEMAND ENDORSE HEREON)** |
| | | |
| Defendants. | | |

**Nature of the Case**

1.      This action presents claims under 42 U.S.C. 1983, as well as state tort claims,  brought in response to violation of Plaintiffs', Christie Messinger ("Ms. Messinger") and B4  Health Management, LLC's ("B4 Health"), constitutional rights by Lorain County Sheriff, Jack Hall ("Sheriff Hall"), in concert with Lorain County Prosecutor, Tony Cillo ("Prosecutor Cillo"),  and Bille Jo Belcher ("Ms. Belcher"), Prosecutor Cillo's Chief of Staff (collectively "Defendants"). Ms. Belcher also serves as Sheriff Hall's Local Agency Security Officer ("LASO") for purposes of accessing information through the  Criminal Justice Information System ("CJIS").

2.      This dispute is related to and arises out of Sheriff Hall's attempts to seize control of the Lorain County 9-1-1 Center ("Lorain  9-1-1 Center") and its systems from the Lorain County Board of Commissioners ("Board").  Sheriff Hall has filed an action in the Lorain County Court of Common Pleas, *Lorain County Sheriff v. The Lorain County Board of County Commissioners*, Case No. 26 CV 000634, asking that court to declare his sole authority over the Lorain 9-1-1

Center.  As set forth below, in addition to filing suit, and in support of it, Sheriff Hall, along with Ms. Belcher and Prosecutor Cillo have also engaged in extralegal activity to aid their political goal of taking control of the Lorain 9-1-1 Center.

3.      Ms. Messinger and her company, B4 Health, have been caught in the political crossfire between Sheriff Hall and the Board and have incurred substantial financial and reputational damage due to the unconstitutional actions of Sheriff Hall, Prosecutor Cillo, and those working at their direction.

4.      The current Lorain 9-1-1 Center was created in 2011 through the merger of the former dispatch center operated by the Lorain County Sheriff's office into Lorain County's pre-existing 9-1-1 center.

5.      The Lorain 9-1-1 Center is now controlled and operated by the Board pursuant to an MOU. (A copy of the MOU is attached as Exhibit A).

6.      The Lorain 9-1-1 Center serves 51 local law enforcement and first responder agencies in Lorain County, pursuant to services agreements with the local agencies.

7.      Shortly after taking office in 2025, Sheriff Hall embarked on a campaign to take over the Lorain 9-1-1 Center. Sheriff Hall's strategy to seize control of the Lorain 9-1-1 Center has included not only civil litigation, but in concert with Prosecutor Cillo's office, misuse and abuse of  law enforcement powers, and the perpetration of intentional torts outside any statutory immunity or contractual authority to accomplish his political goals.

8.      To accomplish his political goal of usurping control of the Lorain 9-1-1 Center from the Board,  and to retaliate against Ms. Messinger for raising questions relating to Ms. Belcher's dual role with Sheriff Hall's office and Prosecutor Cillo's office, reporting data breaches by Sheriff Hall's office to state officials, refusing to provide Sheriff Hall access to confidential data owned

by other law enforcement agencies, and her perceived political association as being aligned with the Board, Sheriff Hall, in concert with Prosecutor Cillo and Ms. Belcher, have engaged in a bogus criminal investigation of Ms. Messinger, forced a breach of her contract with the Board by threatening her with arrest if she continued to perform, tortiously interfering with B4 Health's contract with the City of Cleveland, and defaming her and her company by alleging that she has engaged in unspecified "felony level" violations.

9.      Further, through Prosecutor Cillo's office, Sheriff Hall has issued multiple defective purported grand jury subpoenas designed to intimidate and harass Ms. Messinger. They have used the purported criminal investigation to justify Sheriff Hall's attempts to usurp the Board's control over the Lorain 9-1-1 Center and as a pretext for his "raid" on the County Commissioner's office and on the Lorain 9-1-1 Center, which was not aimed at any legitimate law enforcement purpose, but at generating headlines, harming the electoral prospects of an incumbent Commissioner, gaining information for his civil suit, and advancing Sheriff Hall's political goal of seizing control of the Lorain 9-1-1 Center.

10.     The unlawful actions taken by Sheriff Hall and Prosecutor Cillo against Ms. Messinger and B4 Health are manifestly outside the scope of their employment or official responsibilities, were undertaken with malicious purpose, in bad faith, or in a wanton or reckless manner, and subjects them to civil liability.

**Parties and Related Entities**

11.     Plaintiff  Christie Messinger is an IT services contractor, specializing in providing IT consulting services to government entities, particularly in the field of first responder and criminal justice IT solutions. From 2018 till late 2025, Ms. Messinger was a contractor to Lorain County, hired by the Board to consult and provide support for the Lorain 9-1-1 Center. Ms. Messinger is a citizen of the State of Florida.

3

12. Plaintiff B4 Health is a limited liability company organized under the laws of Texas through which, at all times relevant, Ms. Messinger has done business. Ms. Messinger is the sole member of B4 Health.

13. Defendant Sheriff Jack Hall is the Sheriff of Lorain County, Ohio elected in November of 2024, taking office in January of 2025.

14. Defendant Prosecutor Cillo is the Prosecutor of Lorain County, Ohio.

15. Defendant Billie Jo Belcher is the Chief of Staff to Prosecutor Cillo, hired in January of 2025.  She also serves as the Local Agency Security Officer ("LASO") to the State Criminal Justice Information System ("CJIS") for Sheriff Hall. In addition, she appears to serve additional unspecified roles in the Sheriff's office.  Immediately prior to her employment in Lorain County, Ms. Belcher served as Assistant General Counsel to Central Square Technologies, a company that provides software to support law enforcement and first responder communications, and interfaces with state and federal criminal justice databases.

16. Non-party Tyler Technologies, formerly New World ("Tyler") is a software company that provides software to support law enforcement communications, 9-1-1 dispatch centers, and interfaces with state and federal criminal justice databases. The Lorain 9-1-1 Center system uses Tyler software to, among other things, provide computer aided dispatch ("CAD") services and is aimed at streamlining emergency information for dispatchers and first responders. Lorain County, through the Board, has contracted with Tyler since at least 2018.

17. Non-party the Board is a political subdivision organized and existing under the laws of the State of Ohio with offices at 226 Middle Avenue, Elyria, Ohio 44035.

18. Non-party Rob Berner served as the Director of the Lorain 9-1-1 Center from April 2023 to October 2025.

19. Non-party Kurt Scholl is the current Director of the Lorain 9-1-1 Center.

## Jurisdiction and Venue

20. This Court has jurisdiction over this matter subject to 28 U.S.C. 1332(a).

21. Ms. Messinger is a citizen of the State of Florida.

22. B4 Health is a limited liability company organized under the laws of the State of Texas, with its principal place of business in the State of Florida.

23. The Defendants are all citizens of the State of Ohio.

24. As set forth in this complaint, the amount in controversy exceeds $75,000.00.

25. In addition, this court has jurisdiction over this matter because Plaintiffs bring claims subject to 42 U.S.C. 1983.

## Factual Background

### A. Specialized Terms Used Throughout the Complaint and Related Documents

26. Because this case involves the Lorain 9-1-1 Center, which is used for several functionalities, including the storage of information obtained from certain state and federal law enforcement databases, many of the claims and relevant documents refer to acronyms or specialized terms used in that sector. While the Court is likely familiar with many of these terms, providing a definition will add clarity to the complaint and related documents.

27. The Criminal Justice Information System ("CJIS"), is a law enforcement system maintained by the Federal Bureau of Investigation ("FBI") and has become an umbrella to other FBI maintained law enforcement data systems. Access to CJIS is governed by the federal government, delegated to each state, specifically the FBI CJIS Security policy. There are various levels of CJIS access and permissions and CJIS users must be certified by completing a

background check, sign a Security Addendum (for vendors), and complete certification testing for the appropriate level required for performing job duties.

28.     Local Agency Security Officer ("LASO"), is a mandatory security role required by the FBI's CJIS security policy for any agency that accesses, stores, or processes Criminal Justice Information ("CJI").

29.     The Law Enforcement Automated Data System ("LEADS") is maintained by the State Highway Patrol and is Ohio's law enforcement database and provides users access to NCIC data. Access to LEADS is governed by the state, which certifies users for certain levels of access. Specifically, Adm.Code 4501-2-10, et seq., governs the use of and access to LEADS.

30.     An Originating Agency Identifier ("ORI") is a unique alphanumeric code assigned by the FBI's CJIS Division to identify law enforcement and criminal justice entities. Each ORI is issued to an individual computer terminal authorized to access CJIS within a given agency and each computer connected to LEADS has its own unique ORI. For example, a dispatcher's computer, if accessing LEADS, would be registered with the Agency ORI and with a specific computer ORI. The user must be authorized by submitting his/her request to LEADS along with his/her license

31.     The National Crime Information Center ("NCIC"), a computerized index of criminal justice information (i.e. criminal record history, fugitives, stolen property, missing persons, etc.) that is maintained and administered by the FBI. NCIC is part of the CJIS system.

32.     Ohio Law Enforcement Gateway System ("OHLEG") is a web-based platform used to assist law enforcement in investigating, solving and preventing crimes.

33.     Computerized History Records ("CCH") is a state-controlled fingerprint-based electronic database that tracks an individual's arrests, prosecutions, and disposition records. CCH is used by law enforcement and courts and authorized employers for background checks.

6

34.     Computer Aided Dispatch ("CAD") is a centralized software system used by 911 centers, police and fire to receive emergency calls, dispatch field units, and track responses.

35.     Incident Based Reporting ("IBR") is a data system that tracks context for crimes such as location, time of day, etc. . . . .  Agencies utilizing Tyler New World software submit in accordance with OHIO IBR.  States have the authority to implement more stringent measures and Tyler configurations may be updated to state requirements.

36.     Fire Department Identification Number ("FDID") is used to identify a particular fire department agency.

37.     Field Based Reporting ("FBR"), is the process of collecting and sharing real-time data from onsite locations, eliminating paper workflows by using mobile devices.

38.     First Responder System is a combination of one or more modules including CAD, CAD Mobile, and Case Management.

39.     AVL means Automatic Vehicle Location.

40.     Fire Station Alerting is a system which provides station alerts with detailed call information

41.     ASR – LEADS means an Agency Service Request which is a formal request used to request systems, interfaces and network updates when LEADS systems are present.

   **B.  Lorain County Creates a Centralized 9-1-1 Center**

42.     The history of the Lorain 9-1-1 Center is helpful in understanding Sheriff Hall's dispute with the Board and how Defendants have drawn Ms. Messinger and B4 Health into that dispute.

43.     Pursuant to Ohio statutes, the Board is authorized to operate the Lorain 9-1-1 Center, employ its personnel, enter contracts on its behalf, and to serve as its fiscal agent and contracting authority for Lorain County's emergency communications systems.

44.     The Lorain 9-1-1 Center provides 24-hour emergency dispatching services for Police, Fire, and EMS across Lorain County, Ohio.

45.     The Lorain 9-1-1 Center operates the County's emergency communication systems, including its emergency radio systems.

46.     The Board began providing emergency dispatch and radio services across Lorain County in the early 1980s and the Lorain 9-1-1 Center dates back to 1989.

47.     In 2011, then Lorain County Sheriff, Phil Stammitti, sought to merge the small dispatching office at the Lorain County Jail into the Lorain 9-1-1 Center.

48.     In August of 2011, the Board and the then Sheriff entered into a Memorandum of Understanding for Dispatch Services ("MOU") governing the merger. See Exhibit A.

49.     Under the MOU, the dispatch services previously performed at the Sheriff's Communications Center were consolidated into the Lorain 9-1-1 Center.

50.     The MOU defines the Board as the "Appointing Authority" for purposes of employment as well as vendor contracting and system maintenance at the Lorain 9-1-1 Center. (MOU, Art. IV.)

51.     The MOU provides the Sheriff with "collaborative" but subordinate, "advisory" functions to the Board. (MOU, Art. IV (B)(1)-(8).)

52.     The MOU further acknowledges that Ohio LEADS, CCH, and OHLEG have restrictions imposed by law on who may access such programs. The Sheriff's oversight duties under the MOU are limited to determining whether a person's access to these databases complies with existing law. (MOU, at IV(B)(5)).

53.     Prior to the MOU, the Sheriff played no role in the operation of the Lorain 9-1-1 Center, or emergency dispatching services for the majority of Lorain County.

54. The MOU entered into by Sheriff Stamati and the Board acknowledges that "the Board provides dispatch services for emergency services and employes personnel to operate the 9-1-1 Center" and specifically authorizes the Board to merge dispatch services of other entities with the operations at the 9-1-1 Center, reach agreements with other entities for dispatching services, and those agreements are separate, independent, and not subject to the terms and conditions of "this MOU unless expressly provided therein." (MOU p. 1, and Article I (D).)

55. The Lorain 9-1-1 Center has certain LEADS-related agreements specific to access to LEADS data utilized in the performance of law enforcement services.

56. The Lorain 9-1-1 Center's access to LEADS is governed by several management control agreements, MOU's and Data Sharing Agreements for numerous law enforcement communities. The LEADS-related work that the Lorain 9-1-1 Center performs on behalf of the Lorain County Sheriff is only a small part of the Lorain 9-1-1 Center's duties of providing 24-hour emergency dispatching services for Fire, EMS, and Police across Lorain County.

**C. The Lorain County Commissioners Contract with Ms. Messinger and B4 Health**

57. Lorain County, through the Board began a contractual consulting relationship with B4 Health beginning in 2017.

58. Initially, the Board contracted with B4 Health to provide database and basic systems-related projects specific to Tyler software and functionality.

59. Over time, however, the Board came to rely heavily on B4 Health's assistance and expanded the scope of services for which it contracted with B4 Health.

60. On April 6, 2022, the Board approved a formal resolution entering into a Consulting Services Agreement ("Consulting Agreement") with B4 Health, for the 2022 calendar year, to provide consulting services for the "initial, planning, design, execution, monitoring,

implementation, and sustainability" of the Lorain 9-1-1 Center systems and multi-agency support. A copy of the original Consulting Agreement is attached as Exhibit B.

61. Under the Original Contract, Lorain County, through the Board, agreed to pay B4 Health $72,000.00.

62. The Original Agreement was renewed multiple times by the Board and the amount of the compensation under it has increased to $130,000.00 proposed for 2025-2026.

63. Ms. Messinger has, at all relevant times, maintained the appropriate certifications to access any LEADS generated information within the Lorain 9-1-1 Center's system.

64. The Consulting Agreement, and its renewals, were granted to Ms. Messinger and B4 Health based on Ms. Messinger's certifications as well as her specialized qualifications and knowledge with Tyler software.

65. The Board, as well as the police and fire chiefs served by the Lorain 9-1-1 Center, routinely praised Ms. Messinger and B4 Health for their good work and responsiveness. The Board has stated in court filings that Ms. Messinger's services have been "integral to the implementation, monitoring, and operations of the County 9-1-1 Center."  See Answer and Counterclaim of the Board filed in *Sheriff of Lorain County, Ohio v. Lorain County Ohio Board of Commissioners*, a copy of the Board's Answer and Counterclaim filed in the state court action is attached as Exhibit C.

**D. Sheriff Hall's Conflicts with the Board and Attempted Take-Over of the Lorain 9-1-1 Center**

66. It was apparent even before he took office that Sheriff Hall sought to take control of the Lorain 9-1-1 Center.

67.     For example, before taking office, Sheriff Hall demanded through public records requests records of *all* calls for service and incident reports. This request is far beyond the information that the Sheriff would require to manage his department or fulfill his role under the MOU.

68.     In February of 2025, shortly after she was hired, Ms. Belcher organized a meeting with the Lorian 9-1-1 Center staff and leadership.  At that meeting, Ms. Belcher asked the staff  invasive questions regarding the Lorain 9-1-1 Center security protocols—i.e. seeking security information to which she was not entitled – and demanded that she be given access to all of the Lorain 9-1-1 Center's network information, as well as database schemas of Tyler's software.

69.      In essence, Ms. Belcher demanded full resource access to all databases within the Lorain 9-1-1 Center's system, regardless of whether she, Sheriff Hall, or Prosecutor Cillo had lawful access to the database.

70.     The network information Ms. Belcher demanded is proprietary to the Lorian 9-1-1 Center and to the local law enforcement and first-responder agencies with whom it contracts.

71.     Likewise, the  database schema information she requested is proprietary to Tyler and is a closely guarded trade secret.

72.     Immediately prior to joining Prosecutor Cillo's office and Sheriff Hall's office, Ms. Belcher served as Assistant General Counsel to Central Square, Tyler's main competitor in providing software services to law enforcement and 9-1-1 centers, making her demand for Tyler's proprietary information concerning to Ms. Messinger and Lorain 9-1-1 Center leadership.

73.     In addition, Ms. Belcher walked through the Lorain 9-1-1 Center testing her access badge to determine which areas of the building she had access to and which she did not.  She demanded that in her capacity as the Sheriff's LASO and Prosecutor's Chief of Staff, she be granted unfettered access to all areas of the Lorain 9-1-1 Center.

74.     Immediately, following the meeting, Lorain 9-1-1 Center Director Berner told his staff that he believed that Sheriff Hall was seeking to assert control over the Lorain 9-1-1 Center, that some of Ms. Belcher's requests sought information that the Lorain 9-1-1 Center employees could not legally provide, and that all such information requests from Ms. Belcher or Sheriff Hall were to be routed to him.

75.     Ms. Belcher continued to request information relating to the capabilities of the Tyler software and for information that was proprietary to Tyler.

76.     For example, in an email string in May of 2025 Ms. Belcher demanded Ms. Messinger provide her with a "data dictionary for New World (Tyler)."  A copy of the email string is attached as Exhibit D.

77.     A "data dictionary" is a definition of all databases, tables and attributes of a software system.  It is unique and proprietary to each software company. This is not information that Ms. Belcher, Prosecutor Cillo, or Sheriff Hall would need to do their jobs.

78.     In fact, the Board's contract with Tyler strictly limits the persons and entities who can access that information.

79.     When Lorain 9-1-1 Center IT Supervisor Dave Welch suggested that Ms. Belcher focus her requests on issues relating to Sheriff Hall's office or Prosecutor Cillo's office, Ms. Belcher stated that her request "was aimed at assisting another agency within the County."

80.     When in response to her questions, Ms. Messinger asked if Ms. Belcher was experiencing any issues with any of the software's functions, Ms. Belcher responded that "she needed to know as part of a project." *Id.*

81.     In the same email string, in response to Ms. Messinger's statement that Tyler was "a great product" and an explanation of how certain information is submitted to the State, Ms. Belcher

expressed her dissatisfaction with the Tyler software and again demanded Tyler's data dictionary. *Id.*

82. Again, Ms. Messinger declined to provide the information that Ms. Belcher had demanded.

### E. The Sheriff's Security Breach

83. Sheriff Hall terminated the IT employees supporting his office leaving the department with no IT assistance.

84. Sheriff Hall's department failed to keep its computer security up to date.

85. In July of 2025, an employee of Sheriff Hall's Office, on an asset with access to systems connected to CJIS and LEADS, and while in a session with a 911 resource, compromised the system. Out of an abundance of caution, Ms. Messinger, in coordination with Director Todd Sharkey, IT Supervisor Dave Welch, and TAC Rebecca Pearson, ensured the Sheriff's office disconnected from the Lorain 9-1-1 Center network and began communication according to protocol with LEADS Administrator, Kevin Locke.

86. Mr. Locke acknowledged the breach and advised the Lorain 9-1-1 Center's Terminal Agency Coordinator ("TAC") and Ms. Messinger to disable any compromised account (Trent Irish, Sheriff's Office IT) and to remain disconnected until proof of an uninfected network could be demonstrated.  Ms. Belcher was Sheriff Hall's LASO at the time, and responsible for this aspect of network security.

87. When Ms. Messinger learned of the security breach, she, in coordination with Deputy Chief Kurt Scholl, remained in communication with Kevin Locke at the State of Ohio LEADS system.

88. During the course of the network remediation efforts, Sheriff Hall, Ms. Belcher and their IT staff manually overrode the disabled account and again enabled the compromised account to

13

the LEADS system.  This action was in direct contradiction of the State LEADS administrator's direction to disable the compromised account.

89.    In conjunction with the Board and the leadership of the Lorain 9-1-1 Center, Ms. Messinger again notified the State LEADS administrator. Mr. Kevin Locke instructed Ms. Messinger to disable the compromised account and to create new credentials to ensure the security of the system. This was communicated, again, to Sheriff Hall's office, Ms. Belcher, and their IT staff.  An audit was conducted as to who enabled the user accounts for documentation purposes.

**F. Sheriff Hall Demands Unauthorized Access to Information Related to the July Police Shooting**

90.    The dispute over access to the Lorain 9-1-1 Center information and how it is shared between the county and participating agencies heightened when, on July 24, 2025, three Lorain City Police Officers were ambushed and one of them was killed in the City of Lorain.

91.    Under data sharing agreements and long-standing Lorain 9-1-1 Center policy, while data is centrally housed at the Lorain 9-1-1 Center that data is "owned" by the agency in whose jurisdiction it originates. Thus, because the shooting occurred in Lorain and the Elyria police department was the lead investigating agency, the Lorain police chief (subject to Lorain's agreement with the Lorain 9-1-1 Center) had the right to determine who had access to that data.

92.    Shortly after the shooting, Ms. Belcher, acting on behalf of Sheriff Hall demanded that Ms. Messinger provide her with data relating to the calls and responses on the day of the shooting as well as the AVL logs.

93.    Ms. Messinger consulted with the Lorain police chief and with Mr. Berner, who advised that Elyria was the investigating agency, and any decision to share that information had to be made by Elyria, and not Ms. Messinger or the Lorian 9-1-1 Center. A copy of the email correspondence is attached as Exhibit E.

14

94.     Ms. Messinger again told Ms. Belcher that she was unable to provide the requested information.

95.     Ms. Belcher and Sheriff Hall continued to demand the information.

96.     Sheriff Hall also accused B4 Health of implementing a system that caused Sheriff Hall's office to violate Marcy's Law and requested that Ms. Messinger's contract be terminated effective immediately.  After further investigation and review of documentation, it was determined that Sheriff Hall had removed Ms. Messinger from his projects months prior to the incident (June-July).

### G. The Sheriff and Prosecutor's Bogus and Retaliatory Investigation and Interference with B4 Health's Contract

97.      Sheriff Hall's inability to access the data, Ms. Messinger's reporting of the security breach and Sheriff Hall's overriding of the State's recommendations, as well as her unwillingness to act outside of her contract or violate the information sharing contracts of participating agencies placed Ms. Messinger and B4 Health squarely in Sheriff Hall's crosshairs.

98.     To accomplish his goal of usurping control of the Lorain 9-1-1 Center from the Board, Sheriff Hall engaged resources available to him and through Prosecutor Cillo to remove Ms. Messinger and B4 Health.

99.     As part of his continuing turf war with the Board, and in response to Ms. Messinger's communications with the State and her refusal to provide him with information that he was not entitled to, in September of 2025, Sheriff Hall, with the assistance of Prosecutor Cillo purportedly began a criminal investigation into B4 Health.

100.    On September 5, 2025, in response to questions raised by Ms. Messinger and Lorain 9-1-1 Center Director Berner regarding potential conflicts relating to Ms. Belcher's multiple roles, Sheriff Hall sent a public records request to Lorain 9-1-1 Center Director Rob Berner demanding

15

that he and Ms. Messinger provide him with essentially all communications referencing him or Ms. Belcher. A copy of the Public Records Request is attached as Exhibit F.

101.    On September 24, Sheriff Hall re-sent his public records request, this time attached to a threatening email to Mr. Berner and Ms. Messinger, stating that the purpose of the records was "confirm or dispel an inquiry [sic] my office is making into Lorain County 911, your role as director and the contractual relationship between B4 Health Management, LLC and Lorain County-a contract in which [sic] you manage." Sheriff Hall also indicated that the public records request was being made in response to "serious allegations into an ethics and criminal complaint [that] were alleged by Ms. Messinger which is [sic] being evaluated by my office as well." A copy of Sheriff Hall's September 24, 2025, email is attached as Exhibit G.

102.    In a September 25, 2025 letter to the Board, Ms. Messinger, offered to assist the Board in responding to the request, but again raised questions regarding the apparent conflict of Ms. Belcher serving as an officer of the agency requesting the records as well as the Chief of Staff of Prosecutor Cillo who was tasked with determining which documents could be properly produced as public records. A copy of the September 25, 2025, letter is attached as Exhibit H.

103.    On September 30, 2025, Sheriff Hall sent a letter to Lorain County 911 Director Rob Berner purporting to suspend "access of all records of the Lorain County Sheriff's Office and ORI OH47000 for B4 Health Management, LLC, Dynamic Solutions, Worldwide, Inc. and any and all employees affiliated with either entity to include consultant Christie Messinger." In addition, the letter purported to "ban" Ms. Messinger and B4 Health from "CJI access to any and all records generated, received or transmitted by the Lorain County Sheriff's Office. A copy of Sheriff Hall's September 30, 2025, letter is attached as Exhibit I.

104.	Sheriff Hall further demanded that Mr. Berner meet with him the following day "to confirm the necessary steps have been taken pursuant to this ban to prevent access to our records through the available administrative controls of data bases under the direction of Lorain County 911." *Id.*

105.	Sheriff Hall claimed that his authority to institute the ban arose "pursuant to the authority of my office and confirmed [sic] through Ohio LEADS as I have probable cause that the above-listed entities are suspect [sic] of criminal violations of Ohio law." *Id.*

106.	Sheriff Hall did not indicate what alleged criminal violations he was investigating or provide any facts supporting his claim of probable cause to believe that Ms. Messinger or B4 Health had engaged in any criminal conduct other than to state "[t]he basis of probable cause is drawn from an on-going investigation conducted by my office."

107.	In addition, during that same period, Prosecutor Cillo prevented the Board's renewal of its contract with B4 Health, purporting to hold the contract renewal document for review for form.

108.	On October 6, 2025, Ms. Messinger advised Director Berner that Ms. Belcher's continued interference in the Lorain 9-1-1 Center's operation had made her situation unworkable and that she was unable to perform according to the Consulting Agreement.  A copy of Ms. Messinger's October 6, 2025, letter to Mr. Berner is attached as Exhibit J.

109.	Further, Ms. Messinger raised questions regarding the propriety of Ms. Belcher's role with Sheriff Hall, Prosecutor Cillo, and the Lorain 9-1-1 Center as it related to Sheriff Hall's public records requests. Specifically, Ms. Belcher worked for both the office making the requests and was Chief of Staff of the office tasked with reviewing and determining whether the requested documents were public records.

110.	In mid-October of 2025, B4 Health received what purported to be a Grand Jury subpoena seeking :

1. Any and all registration information and, business tax records and franchise tax records for both the State of Ohio and the State of Texas.
2. All contracts and/or agreements with Lorain County for consulting services provided to Lorain County 911 for the period from 1/1/2018 until the present.
3. Any and all invoices, vouchers and payment information submitted to or received from Lorain County for the period from 1/1/2018 until the present.
4. Proof of professional liability insurance, including policy coverage and payment information.
5. Any and all contract and/or agreements with the City of Cleveland for consulting services pertaining to the Motorola Migration Project for the years 2024 and 2025.
6. Any and all invoices, vouchers and payment information submitted to or received from the City of Cleveland for the period from 1/1/2024 until the present.
7. All written and electronic (email, text and documents) correspondence from B4 Health Management, LLC and/or Christie Messinger with Lorain County employees Robert Berner, Kurt Scholl, Karen Perkins or Jeff Armbruster from January 6, 2025 through October 14m 2025.  Any and all electronic devices utilized by Messinger shall include the following keyword searches relevant to the requested time period:
   - Keyword:  Billie, Jille Jo, Belcher, or Billie Jo Belcher
   - Keyword: Cloud or cloud migration
   - Keyword: CJIS
   - Keyword VINE or victim notification

A copy of the purported October 17, 2025, subpoena is attached as Exhibit K.

111.    This Complaint refers to the subpoenas referenced in this Complaint as purported subpoenas because to date, there is no evidence that they were authorized by the grand jury or that there ever was a grand jury investigation relating to Ms. Messinger or B4 Health.

112.    Further, the subpoena facially failed to comply with the Ohio Rules of Criminal Procedure because it was never filed with the Clerk of Courts.

113.    In addition, the purported subpoena did not refer to a particular defendant or a particular grand jury investigation, or case number, as is typical for grand jury subpoenas.

114.    Counsel for B4 Health and Ms. Messinger responded to the purported subpoena both by written objection and in conferences with Sheriff Hall's investigator, Mike Massie. Notwithstanding its objections, B4 Health voluntarily produced documents in response.  A copy

18

of B4 Health's Written Objection and Response to the purported subpoena are attached as Exhibit L.

115.    Mr. Massie and Prosecutor Cillo claimed that B4 Health was being investigated for fraudulently inducing a contract with the Board, including, among other things, failing to pay taxes that had allegedly led to the cancellation of B4 Health's corporate charter in Texas.

116.    In responding to the purported subpoena, B4 Health and Ms. Messinger provided documents—which were publicly available through the Ohio Secretary of State and the Texas Secretary of State's website— showing that B4 Health had, in fact, paid all required taxes in Texas, met all required corporate filing requirements, and was an active Texas limited liability company in good standing lawfully registered to do business in Ohio.  Copies of those records  are attached as Exhibit M.

117.    A simple search of the Texas Secretary of State's website would have revealed that the Sheriff and Prosecutor's alleged concerns that B4 Health had failed to pay its taxes in Texas lacked any basis in fact and that B4 Health was an existing entity in good standing. A copy of the Texas Secretary of State's website page relating to B4 Health is attached as Exhibit N.

118.    The investigators for Sheriff Hall and Prosecutor Cillo either failed to take this basic step, or having taken it, nevertheless decided to proceed with a purported subpoena.

119.    Moreover, it is unclear how B4 Health's corporate status as a Texas limited liability company would have any bearing on any potential crime in Lorain County.

120.    On November 7, 2025, Sheriff Hall escalated his attack on Ms. Messinger and B4 Health, sending Director Berner a letter purporting to "ban" her, her company, and any employees or contractors from the Lorain 9-1-1 Center, based on his alleged criminal investigation.

121.    Specifically, Sheriff Hall's  November 7, 2025, letter  demands that Ms. Messinger be removed "from any role, access, or involvement with Lorain County 911" and that Ms. Messinger "shall be removed from all duties related to the 911 agency as related to LEADS, NCIC and CJIS effective immediately and that confirmation of this action be provided in writing no later than close of business on Monday—November 10, 2025. "  A copy of Sheriff Hall's November 7, 2025 Letter is attached as Exhibit O.

122.    On November 10, 2025 Ms. Messinger notified the Board through counsel that despite Sheriff Hall's interference, she could perform under the Consulting Agreement and requested that the board approve its renewal. A copy of the November 10, 2025, letter is attached as Exhibit P.

123.    Notwithstanding that Sheriff Hall lacked any authority over her contract with the Board, the performance of her duties, or her permission to administer the Tyler software that housed certain information from LEADS, NCIC, or CJIS (which are governed by state and federal authorities), Ms. Messinger reasonably believed, and continues to believe, that she would be subject to arrest by Sheriff Hall if she entered into the Lorain 9-1-1 Center or attempted to perform her duties under the contract, even those duties that do not directly relate to accessing LEADS, NCIC and CJIS databases.

124.    Ms. Messinger, through counsel, attempted to negotiate a contract renewal that would allow B4 Health to continue providing consulting services but demands from the Prosecutor's office made that impossible.  On December 5, 2025, Ms. Messinger, through counsel, notified the board that B4 Health's role "as Consultant to Lorain County 911 terminated as of 5:00 p.m. on November 10, 2025, in direct response to Lorain County Sheriff Jack Hall's Formal Request for Removal of Christie Messinger from Lorain County 911 and CJI aAcess by letter dated November 7, 2025." A copy of the December 5, 2025 letter is attached as Exhibit Q.

20

125.    The purported investigation has thus far involved vague accusations, not clearly related to any criminal violations, several procedurally deficient subpoenas issued by Prosecutor Cillo, issued under threat of criminal jeopardy without requisite due process protections afforded by the United States Constitution.

126.    As Ms. Messinger and B4 Health have responded to these requests, notwithstanding their facial invalidity, Sheriff Hall and Prosecutor Cillo have continually shifted the focus of their alleged investigation.

127.    Based on statements made by Mr. Massie, the focus of the investigation had changed from B4 Health's alleged operation without a valid Texas charter to alleged overbilling by B4 Health. Specifically, having reviewed the records voluntarily provided to him, Mr. Massie observed that B4 Health and Ms. Messinger could not have possibly provided services equal to the number of hours billed to both the City of Cleveland and Lorain County.

128.    Ms. Messinger responded, through counsel, that B4 Health had subcontractors who assisted in providing the services to both the City of Cleveland and Lorain County – a notion that Mr. Massie's "conclusion in search of evidence" failed to even consider.

129.    Advancing the attack, Sheriff Hall then contacted the City of Cleveland, which had contracted with B4 Health ("the Cleveland Contract"), and made damaging and disparaging statements about Ms. Messinger and B4 Health to the officials in charge of that contract in relation to the purported investigation.

130.    Upon information and belief, Sheriff Hall made false statements similar to those made his correspondence the Board (and later to State Leads Administrator, Kevin Locke) about B4 Health and Ms. Messinger which caused the City of Cleveland to suspend the Cleveland Contract with B4 Health.

131. In early December 2025, B4 Health received a second purported subpoena, through counsel. The second purported subpoena repeated some of the same requests, for which B4 Health had already provided documents or indicated that Prosecutor Cillo had constructive possession of, and also requested the "names and contact information of all subcontractors and/or employees of B4 Health Management, LLC, who were involved in providing services to Lorain County 911 and/or the City of Cleveland, Ohio, to include a) Full name, b) Role or job title, c) Contact information (phone number, email address, and mailing address), d) Dates of service or involvement and e) Nature of services provided. A copy of the purported December 9, 2025 subpoena is attached as Exhibit R.

132. Like the earlier purported subpoena, the December purported subpoena was never filed with the Clerk's office and otherwise failed to comply with Crim.R. 17.

133. Again, Ms. Messinger, through counsel, made appropriate objections to the subpoena. But not withstanding those objections, provided the requested information regarding B4 Health's contractors. A copy of the Response to the December purported subpoena is attached as Exhibit S.

134. Subsequently, Sheriff Hall demanded interviews with B4 Health's contractors.

135. While Ms. Messinger provided her contractors' contact information in December of 2025, on information and belief, no interviews have taken place.

136. Later in December, Sheriff Hall again escalated his attack on the Board, through Ms. Messinger, this time claiming that Ms. Messinger had improperly accessed LEADS data.

137. The LEADS computer records show that Ms. Messinger would not have had the requisite permission to access the data that Sheriff Hall alleged she had accessed.

138. Nevertheless, Sheriff Hall made this claim to Kevin Locke, the State LEADS Administrator. A copy of the Sheriff's letter to Mr. Locke is attached as Exhibit T.

22

**H.    The Board's Resolution and Settlement with Ms. Messinger**

139.    On March 27, 2026, in response Sheriff Hall and Prosecutor Cillo's spurious allegations of billing fraud, the Board unanimously approved a resolution confirming that "the invoicing from B4 Health for consulting services [from 2017 through November 10, 2025]  was submitted in accordance with the contract as supplemented" and that "[i]invoices submitted by B4 Health were reviewed and deemed appropriate throughout the consulting period."  A copy of the Resolution is attached as Exhibit U.

140.    The Resolution and Settlement also addressed the fact that B4 Health continued to provide consulting services and support the Lorain 9-1-1 Center in 2025 under terms negotiated with the Board. Those terms were never incorporated into a new consulting agreement because Prosecutor Cillo held up finalizing the contract.

141.    Under the Board's resolution B4 Health would be paid for the time devoted to supporting the Lorain 9-1-1 Center through December 10, 2025.  Ms. Messinger would also be paid to transition IT administrative services to another qualified vendor/employee.  A copy of the Settlement Agreement is attached as Exhibit V.

142.    Prosecutor Cillo, who serves as legal advisor to the Board, is tasked with reviewing the Board's contracts for form.

143.    In this case, although the Settlement Agreement was authorized on March 24, 2026, Prosecutor Cillo has refused to allow the County Auditor to pay the settlement amount, claiming that he is still reviewing the Settlement Agreement.

144.    B4 Health and Ms. Messinger have suffered damages as a result of Prosecutor Cillo's interference with Settlement Agreement.

23

### I.  Sheriff Hall's Civil Suit Against the Board

145.    On March 4, 2026, Sheriff Hall filed a civil complaint against the Board in the Court of Common Pleas for Lorain County, Ohio.  The complaint alleges breaches of the MOU and seeks a declaration that Sheriff Hall has plenary authority over the Lorain 9-1-1 Center. A copy of Sheriff Hall's Civil Complaint is attached as Exhibit W.

146.    The complaint substantially misrepresents Sheriff Hall's authority over the Lorain 9-1-1 Center and asks the court to declare that Sheriff Hall has unlimited access to and plenary authority over the Lorian 9-1-1 Center.

147.    One of the purported bases of Sheriff Hall's Civil Complaint is the allegation that B4 Health and Ms. Messinger engaged in unspecified "potential criminal conduct." Sheriff Hall has also alleged that his investigation involves felony-level offenses and the investigation is being conducted by his public corruption unit.

148.    Sheriff Hall's Civil Complaint makes clear that his goal is to take over the Lorian 9-1-1 Center. Indeed, Sheriff Hall, through counsel, asserts that he has "sole authority" to operate Lorain County's emergency communications systems. *Id.*

149.    While in most cases, Sheriff Hall's Civil Complaint redacted mentions of Ms. Messinger and B4 Health, even adding a footnote remarking on the redactions and the "ongoing criminal investigation."

150.    On April 6, 2026, the Board filed a Counterclaim against Sheriff Hall, correctly describing the Sheriff Hall's actions as a "political power grab," and stating that "the Sheriff has wrongfully and without any authority sought to usurp the Board's administration of the Lorain 9-1-1 Center and the County's emergency communications systems." Exhibit C.

24

151. The Board's counterclaim alleges various misconduct by Sheriff Hall beyond that alleged here, and states that the Lorian 9-1-1 Center has independent authority to access LEADS-related data and that Sheriff Hall, either by misunderstanding or intentionally, "conflates the Lorain 9-1-1 Center's Tyler New World system, with the Lorain 9-1-1 Center's access to LEADS-related information" in an "attempt to falsely assert control over the Lorain 9-1-1 Center's operations." *Id.* at p. 13-14.

**J. The Sheriff Raids the County Commissioners' Office and the County 9-1-1 Center**

152. Consistent with Sheriff Hall's prior actions abusing his law enforcement powers for political gain, on April 30, 2026, the day after the Board sought a preliminary injunction against him in the civil suit and less than a week before a primary election where a Sheriff Hall-supported candidate faced off against one of the incumbent Board members, Sheriff Hall, with the assistance of Prosecutor Cillo, conducted a "raid" of the Board's offices, as well as the offices of the Lorain 9-1-1 Center, purportedly to execute search warrants in connection with his alleged on-going criminal investigation of Ms. Messinger.

153. Before executing the warrants, Sheriff Hall directed Russell Hines to turn off the security cameras in the Board's office and the Lorian 9-1-1 Center.

154. Mr. Hines complied, and once the cameras were turned off, Sheriff Hall's deputies proceeded to execute the warrant.

155. In addition to seizing numerous documents and computers, Sheriff Hall's deputies prevented employees at the Lorain 9-1-1 Center from leaving the building for roughly 8-10 hours.

156. During that time, deputies questioned employees privately without advising them of their Miranda rights.

25

157.     While Sheriff Hall has publicly claimed that the raid and the warrants were for the purpose of his "on-going criminal investigation" relating to fraud and improper access to the LEADS data, Sheriff Hall's real purpose was to embarrass the Board politically, intimidate them in his civil suit, and obtain information for his civil suit.

158.     During the raid, which again, was at least partially aimed at determining whether anyone had gained unauthorized access to LEADS data, Sheriff Hall's deputies neglected to interview any personnel in the Lorian 9-1-1 Center's CJIS compliance department.

159.     Further to the extent that the "raid" and warrants were purportedly aimed at uncovering alleged fraud by Ms. Messinger, Sheriff Hall's deputies asked only cursory questions to the Lorain 9-1-1 Center employees regarding Ms. Messinger, specifically, whether the employees knew or had worked with Ms. Messinger.

160.     Simply put, Sheriff Hall, with the assistance of Prosecutor Cillo, used Ms. Messinger and B4 Health, and the purported criminal investigation into them as a pretext for Sheriff Hall's raid and seizure of county documents, including SOG's, employee files, employee procedures, downloads of all computers, including the Director's computer.  However, they excluded the Warrant and Records areas, which is one of the main departments working with LEADS.

161.     Sheriff Hall and representatives from his office made statements that a vendor to the Lorain 9-1-1 Center committed public corruption.

162.     On May 13, 2026, the Board amended its Counterclaim to add a claim for abuse of process against Sheriff Hall.

**COUNT I: Action under 42 U.S.C. 1983**
**for Deprivation of Property Right Without Due Process**

163.     Plaintiffs restate the allegations of Paragraphs 1 through 162 and incorporate them here as if fully re-written.

164.    B4 Health and Ms. Messinger had a property interest in continued contracting with Lorain County as well as in the contract with the City of Cleveland.

165.    The Board was satisfied with B4 Health's performance and wanted to renew B4 Health's contract.  The Board and B4 Health in fact negotiated and agreed to a contract renewal.

166.    In 2026, B4 Health was to be paid $130,000.00, under its proposed contract. B4 Health had contracted with Lorain County since 2018, and its contract had always been renewed but for the interference of Sheriff Hall and Prosecutor Cillo.  B4 Health has a reasonable expectation that the Board would have continued to renew its contract indefinitely.

167.    Sheriff Hall has claimed the power to ban B4 Health, Ms. Messinger and any of B4 Health's employees or contractors from the Lorain 9-1-1 Center.

168.    Ms. Messinger reasonably believes that she or her employees or contractors would be subject to arrest by Sheriff Hall if she or any employee or contractors of B4 attempted to enter the Lorain 9-1-1 Center or perform the consulting work for which the Board had contracted.

169.    B4 Health and Ms. Messinger were not provided with any notice or hearing before Sheriff Hall purportedly banned B4 Health from the Lorain 9-1-1 Center and made it impossible to perform the contract.

170.    As a result, the Board essentially cancelled B4 Health's contract and suspended any renewals indefinitely, causing B4 Health damages in excess of $75,000.00.

171.    In so doing Sheriff Hall has exceeded any powers granted him by statute or under any agreement, and acting under color of law has deprived B4 Health and Ms. Messinger of their constitutional right to due process under the Fourteenth Amendment of the United States Constitution.

27

172.    Upon information and belief, Prosecutor Cillo participated in preparing the warrant for the raid on the pretext that B4 Health is guilty of public corruption.

173.    In addition, Prosecutor Cillo has held the most recent contract negotiated by B4 and the Board and prevented payment of the Settlement Agreement, ostensibly for review of form of those contracts.

174.    In reality, Prosecutor Cillo has acted in concert with Sheriff Hall to deprive B4 Health and Ms. Messinger of their property rights in the current contract and likely renewals, as well as deprive Ms. Messinger of her right to payment under the Settlement Agreement.

175.    Further, Sheriff Hall, without privilege and for the purposes of retaliating against Ms. Messinger and B4 Health, contacted the City of Cleveland and indicated that Ms. Messinger was under investigation for felony level offenses.

176.    At the time, Ms. Messinger had an ongoing contractual relationship with the City of Cleveland to provide services.

177.    When he made these statements, Sheriff Hall had no evidence to support the claim or even probable cause to show that Ms. Messinger had committed any offense. Instead, the contact with the City of Cleveland was made with the intent of harming Ms. Messinger and her business in service to Sheriff Hall's political goal of ousting the Board from control of the Lorain 9-1-1 Center.

178.    Again, neither B4 Health nor Ms. Messinger were provided any notice or hearing before Sheriff Hall interfered with the Cleveland Contract. Nor has Ms. Messinger had any opportunity, outside of this filing, to address Sheriff Hall's and Prosecutor Cillo's unsupported innuendo that she has committed felony offenses.

179. The Defendants' conduct, as described throughout this complaint, has been reckless or callously indifferent to the Plaintiff's constitutional rights and has been motivated by evil intent, to wit, to serve the Defendants' personal political goals.

180. As a result of the Sheriff's conduct, B4 Health and Ms. Messinger have been damaged in an amount to be determined at trial but exceeding $75,000.00.

**COUNT II: Action Under 42 U.S.C. 1983 for**
**Retaliation by the Sheriff for Ms. Messinger's First Amendment Right to Free Speech**

181. Plaintiffs restate the allegations of Paragraphs 1 through 180 and incorporate them here as if fully re-written.

182. Federal courts have recognized a constitutional right to be free from government retaliation for engaging in protected speech.

183. Ms. Messinger engaged in protected speech relating to the operation of the Lorian 9-1-1 Center.

184. Specifically, Ms. Messinger raised issues with the Lorian 9-1-1 Center leadership and the Board regarding the propriety of Ms. Belcher's involvement in the Lorain 9-1-1 Center on behalf of both Sheriff Hall and the Prosecutor Cillo.

185. In addition, Ms. Messinger engaged in conversations with and correspondence with Kevin Locke and other state officials regarding Sheriff Hall's employee's compromised computer terminal and advised that the terminal be disabled.

186. Further, Ms. Messinger engaged in protected First Amendment activity when she declined to provide Ms. Belcher, Sheriff Hall, and the Prosecutor Cillo with Lorain 9-1-1 Center information which they were not entitled to have.

187. In retaliation for this speech and refusal to speak, Ms. Belcher, Sheriff Hall and Prosecutor Cillo, acting under color of law, retaliated against Ms. Messinger by banning her from the Lorain 9-1-1 Center and preventing B4 Health from performing its valid contract with the Board.

188. Further, Sheriff Hall and Prosecutor Cillo have engaged in a criminal investigation of Ms. Messinger, without probable cause, in retaliation for her exercise of her First Amendment rights and to further their political goals in their conflict with the Board. .

189. Specifically, Sheriff Hall and Prosecutor Cillo have issued procedurally deficient and potentially sham subpoenas to harass Ms. Messinger and B4 Health.

190. In so doing, the Defendants violated Ms. Messinger's constitutional right to be free from retaliation for protected speech.

191. The Defendants' conduct, as described throughout this complaint, has been reckless or callously indifferent to the Plaintiff's constitutional rights and has been motivated by evil intent, to wit, to serve the Defendants' personal political goals.

192. As a result, Ms. Messinger has been damaged in an amount to be determined at trial and is further entitled to statutory damages and attorneys' fees under 42 U.S.C. §1983.

### COUNT III: Action under 42 U.S.C. 1983 for
### Retaliation by the Sheriff for Ms. Messinger's First Amendment Freedom of Association.

193. Plaintiffs restate the allegations of Paragraphs 1 through 192 and incorporate them here as if fully re-written.

194. Federal courts have recognized a person's constitutional right to be free from government retaliation based on their political association.

195. In this case, Ms. Messinger has associated herself with the Board, both by contract and by providing other services and information to the Board.

196. Sheriff Hall views the Board as a political rival for his control over the Lorain 9-1-1 Center.

197. Because of Ms. Messinger's real and perceived association with the Board, Ms. Belcher, Sheriff Hall, and Prosecutor Cillo, acting under color of law, retaliated against her as set forth above by seeking to ban her from the Lorain 9-1-1 Center, interfering with B4 Health's contracts, launching a bogus criminal investigation without probable cause for political purposes.

198. The Defendants' conduct, as described throughout this Complaint, has been reckless or callously indifferent to the Plaintiffs' constitutional rights and has been motivated by evil intent, to wit, to serve the Defendants' personal political goals.

199. Ms. Messinger and B4 Health have been damaged in amount to be proven at trial and are further entitled to statutory, exemplary damages and attorneys' fees.

<h3 style="text-align:center">COUNT IV: Tortious Interference with Contracts</h3>

200. Plaintiffs restate the allegations of Paragraphs 1 through 199 and incorporate them here as if fully re-written.

201. B4 Health had valid contracts with Lorain County and the City of Cleveland to provide consulting services.

202. In addition, Ms. Messinger and B4 Health entered into a settlement agreement with the Board relating to the breach of her 2026 contract.

203. The Defendants knew of these contracts.

204. The Defendants, without privilege to do so, tortiously interfered with the contracts, and caused their breach.

205. Specifically, Sheriff Hall has made it impossible for B4 Health to perform its contract or obtain renewal of its contract with the Board, falsely accused Ms. Messinger of criminal activity, leading to the cancellation of the Cleveland Contract, and Prosecutor Cillo has intentionally and wrongfully prevented the renewal of B4 Health's contract with the Board and the Settlement

Agreement by abusing his authority to review contracts for form to withhold performance of those contracts.

206.    The Defendants' conduct, as described throughout this complaint, has been malicious and has been motivated by evil intent, to wit, to serve the Defendants' personal political goals.

207.    As a result, B4 Health and Ms. Messinger have incurred damages in amount to be determined at trial but exceeding $75,000.00.

**COUNT V: Defamation**

208.     Plaintiffs restate the allegations of Paragraphs 1 through 207 and incorporate them here as if fully re-written.

209.    Sheriff Hall has intentionally and maliciously engaged in defamation per se by making false statements to the Board and the City of Cleveland, the parties with which B4 Health contracted, that Ms. Messinger had engaged in multiple criminal violations or that he had probable cause to support a claim that Ms. Messinger had engaged in felony-level criminal activity.

210.    Those statements were knowingly false or made recklessly without regard for their truth or falsity.

211.    Further, those statements were specifically intended to harm Ms. Messinger in her business.

212.    In addition, Sheriff Hall has falsely alleged to state officials that Ms. Messinger improperly accessed the LEADS system. This statement was knowingly false and with the intent to harm Ms. Messinger in her business.

213.    As a result, Ms. Messinger, through her company B4 Health, has been damaged in her reputation and has lost current and renewable contracts and has been hindered in her ability to obtain new contracts.

214.    Ms. Messinger has been damaged in an amount to be determined at trial but exceeding $75,000.00.

**WHEREFORE**, Plaintiffs pray for the following relief:

**As to Count One**, money damages, in an amount to be determined at trial, as well as punitive damages and all costs and fees, including reasonable attorneys' fees;

**As to Count Two**, money damages, in an amount to be determined at trial, as well as punitive damages and all costs and fees, including reasonable attorneys' fees;

**As to Count Three**, money damages, in an amount to be determined at trial, as well as punitive damages and all costs and fees, including reasonable attorneys' fees;

**As to Count Four**, money damages, in an amount to be determined at trial, but in excess of $75,000, as well as punitive damages and all costs and fees, including reasonable attorneys' fees;

**As to Count Five**, money damages, in an amount to be determined at trial, but in excess of $75,000, as well as punitive damages and all costs and fees, including reasonable attorneys' fees;

In addition, Plaintiffs pray for any other relief that the Court deems just and equitable.

Respectfully submitted,

*/s/ Jay R. Carson*
Jay R. Carson                (0068526)
Angela Lavin                 (0069604)
WEGMAN HESSLER
6055 Rockside Woods Blvd. Ste. 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Email: jrcarson@wegmanlaw.com
          amlavin@wegmanlaw.com

*Attorneys for Plaintiffs*

33

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a jury on all issues so triable.

*/s/ Jay R. Carson*

Jay R. Carson                    (0068526)

*One of the Attorneys for Plaintiffs*